## IN THE CIRCUIT COURT OF THE 13TH JUDICIAL CIRCUIT
## IN AND FOR HILLSBOROUGH COUNTY, FLORIDA

M.W., a Minor Child, Through His Legal
Representative and Natural Guardian,
ANASTAZIA J. WOOD; ANASTAZIA J. WOOD,
an individual and natural parent of M.W.; JUSTIN
WOOD, an individual and natural parent of M.W.,
and SUZANNE P. MCCARTHY, an individual,

   Plaintiffs,

  v.

FORD MOTOR COMPANY, a Delaware
corporation; ENTERPRISE HOLDINGS, INC., a
Delaware corporation; ENTERPRISE RENT-A-
CAR, a Florida business; EAN TRUST, a Delaware
trust; ENTERPRISE LEASING COMPANY OF
FLORIDA, LLC, a Delaware corporation;
ENTERPRISE LEASING COMPANY OF
ORLANDO, LLC, a Delaware corporation, CRAIG
R. WOLFF, M.D., a Florida resident, LASER
SPINE INSTITUTE, LLC, a Florida Corporation,
and LASER SPINE SURGICAL CENTER, LLC, a
Florida corporation,

   Defendants.

Case No. : 2014-CA-8573

Division:

### AMENDED COMPLAINT

  Plaintiffs M.W., a minor child, through his legal representative and natural guardian,

ANASTAZIA J. WOOD, ANASTAZIA J. WOOD, individually and as the natural parent of

M.W., JUSTIN WOOD, individually and as the natural parent of M.W., and SUZANNE P.

MCCARTHY, individually (collectively "Plaintiffs") bring this action against Defendants FORD

MOTOR COMPANY ("FORD"), ENTERPRISE HOLDINGS, LLC, ENTERPRISE RENT-A-

CAR, EAN TRUST, ENTERPRISE LEASING COMPANY OF FLORIDA, LLC,

ENTERPRISE LEASING COMPANY OF ORLANDO, LLC (collectively "ENTERPRISE"),

CRAIG R. WOLFF, M.D., a Florida resident, LASER SPINE INSTITUTE, LLC, a Florida Corporation, and LASER SPINE SURGICAL CENTER, LLC, a Florida corporation,

## PARTIES AND SERVICE OF PROCESS

1. On August 6, 2014, a Complaint was filed on behalf of the Plaintiff against the Defendant via the e-portal. The Complaint, Civil Cover Sheet and Request for Division for Assignment was received. A payment of $403.00 was received and confirmed. See Exhibit A.

2. It is the Plaintiff's position that the e-portal computer fields were properly filled out, in that the field for the Defendant indicated that, "at least one of the Defendants is required". The Plaintiff filled out the required field and listed at least one Defendant. See Exhibit B.

3. Notwithstanding, on August 6, 2014, the undersigned attorney received an email requesting the following correction "please enter the name and address in the parties screen for all parties listed in the Complaint".

4. The undersigned counsel's legal assistant timely made the requested correction via the e-portal within the time period referred to in the email of August 6, 2014.

5. On August 22, 2014, the undersigned counsel received an email indicating that the correction had not been received and our original filing would not be processed. See Exhibit C.

6. The undersigned counsel received no email or warning that the clerk's office did not receive our corrections that were timely made.

1091685.3

7.      On August 22, 2014, the undersigned counsel discussed the situation with the clerk's office and was informed that there was not a way to enter the system and add the name and addresses to the parties screen once the filing had been removed for "Judicial Review".

8.      The undersigned counsel was advised by the clerk's office that Plaintiff would need to re-file the Complaint and set forth within it that in fact it was filed on August 6, 2014, and an error with the e-portal filing occurred.

9.      At all times relevant herein, Plaintiffs, ANASTAZIA J. WOOD and JUSTIN WOOD, are and were residents and citizens of Tampa, Hillsborough County, Florida. Plaintiffs, ANASTAZIA J. WOOD and JUSTIN WOOD, are the natural parents of M.W., a minor.

10.     At all times relevant herein, Plaintiff M.W., a Minor Child through His Legal Representative and Natural Guardian, Plaintiff ANASTAZIA J. WOOD, is and was a resident and citizen of Tampa, Hillsborough County, Florida.

11.     At all times relevant herein, Plaintiff SUZANNE P. MCCARTHY is and was a citizen and resident of Port Charlotte, Charlotte County, Florida. Plaintiff SUZANNE P. MCCARTHY is the natural mother to Plaintiff ANASTAZIA J. WOOD and natural grandmother to Plaintiff M.W.

12.     On dates set forth, the Plaintiff, Suzanne P. McCarthy, was provided medical care y Craig R. Wolff, M.D., a Florida licensed physician located in Tampa, Florida,

13.     At all times material hereto, the aforesaid Craig R. Wolff, M.D., was a employer and/or agent of the laser Spine Institute, LLC, and the Laser Surgical Center, LLC, both Florida Limited Liability Corporations.

14. At all times relevant herein, Defendant FORD MOTOR COMPANY is and was a Delaware corporation with its principle place of place at One American Road Dearborn, MI 48126. FORD designed, manufactured, marketed, sold, advertised, and/or distributed the subject vehicle. FORD operated, conducted, engaged and/or carried on a business venture in the State of Florida or had an office or agency in the State of Florida within the meaning of Fla. Stat, 648.193. FORD may be served with process by delivering summons and a copy of this Complaint to its registered agent for service of process: CT Corporation System 1200 South Pine Island Road Plantation, Broward County, FL 33324.

15. At all times relevant herein, FORD was and is a corporation licensed and/or doing business in Hillsborough County, Florida, and was engaged in the business of designing, manufacturing, fabricating, assembling, distributing, testing, marketing and selling FORD automobiles. The subject vehicle was commonly advertised, sold, used and consumed in Hillsborough County, Florida, in the ordinary course of commerce, trade, or use within the meaning of Fla. Stat. 48.193.

16. At all times relevant herein, Defendant ENTERPRISE HOLDINGS, INC. was and is a Missouri corporation with its principal place of business at 600 Corporate Park Drive St. Louis, MO 63105. According to Defendant ENTERPRISE HOLDINGS, INC., Defendant ENTERPRISE HOLDINGS, INC. "own[s] and operate[s] almost 1.3 million cars and trucks" and is the "largest car rental service provider in the world," operating "more than 8,200 airport and neighborhood locations under the Enterprise-Rent-A-Car, National Car Rental, and Alamo Rent A Car brands." *See* http://www.enterpriseholdings.com/; http://www.enterpriseholdings.com/siteAssets/EHI%20fact%20sheets_wFleet_rev%2020130605 .pdf (last accessed on July 1, 2013). Enterprise Rent-A-Car brand is a division of Defendant

ENTERPRISE HOLDINGS, INC.  Defendant ENTERPRISE HOLDINGS, INC. may be served with process by delivering summons and a copy of this Complaint to its registered agent for service of process: CT Corporation System 120 S. Central Ave. St. Louis, MO 63105.

17.     At all times relevant herein, Defendant ENTERPRISE RENT-A-CAR is a retail Enterprise-Rent-A-Car office at 4509 Tamiami Trail, Port Charlotte, FL 33980, which was and is in the business of servicing, maintaining, and renting vehicles to consumers including the FORD Focus which was the subject of this accident.  On information and belief, Defendant ENTERPRISE RENT-A-CAR may be served with process by delivering summons and a copy of this Complaint to Paul Hladun 4509 Tamiami Trail, Port Charlotte, FL Charlotte County 33980.

18.     At all times relevant herein, Defendant EAN TRUST was and is a foreign trust incorporated in Delaware with its principle place of business as 600 Corporate Park Drive St. Louis, MO 63105.  Defendant EAN TRUST was and is the registered owner of the subject vehicle and is licensed to do business and maintains an office in Florida at 6800 N. Dale Maybry Hwy, Ste. 158 Tampa, Hillsborough County, FL 33614.  Defendant EAN TRUST may be served with process by delivering summons and a copy of this Complaint to its registered agent for service of process: CT Corporation System 1200 South Pine Island Road Plantation, Broward County, FL 33324.

19.     At all times relevant herein, Defendant ENTERPRISE LEASING COMPANY OF FLORIDA, LLC was and is a Delaware corporation with its principal place of business at 600 Corporate Park Drive St. Louis, MO 63105.  On information and belief, Defendant ENTERPRISE LEASING COMPANY OF FLORIDA, LLC is a division of Defendant ENTEPRISE HOLDINGS, INC and a beneficiary of Defendant EAN TRUST.  Defendant ENTERPRISE LEASING COMPANY OF FLORIDA, LLC may be served with

10916853

process by delivering summons and a copy of this Complaint to its registered agent for service of process: CT Corporation System 1200 South Pine Island Road Plantation, Broward County, FL 33324.

20.     At all times relevant herein, Defendant ENTERPRISE LEASING COMPANY OF ORLANDO, LLC was and is a Delaware corporation with its principal place of business at 5442 Hoffner Ave Orlando, Orange County, FL 32812. On information and belief, Defendant ENTERPRISE LEASING COMPANY ORLANDO, LLC is a division of Defendant ENTEPRISE HOLDINGS, INC and a beneficiary of Defendant EAN TRUST. Defendant ENTERPRISE LEASING COMPANY OF ORLAND, LLC may be served with process by delivering summons and a copy of this Complaint to its registered agent for service of process: CT Corporation System 1200 South Pine Island Road Plantation, Broward County, FL 33324.

21.     At all relevant times herein, Defendant ENTERPRISE serviced, maintained, inspected, and rented the FORD Focus which was the subject of this accident.

### JURISDICTION AND VENUE

22.     This Court has jurisdiction over Defendant because at all times material hereto, Defendants conducted business in Hillsborough County, Florida and maintained sufficient minimum contacts with the State of Florida such that the exercise of jurisdiction over such defendant would not offend traditional notions of fair play and substantial justice.

23.     This Court has jurisdiction over this cause of action because the amount in controversy, exclusive of interest and costs, exceeds the jurisdictional thresholds of this Court.

24.     Venue of this cause of action is proper in Hillsborough County, Florida pursuant to Fla. Stat. § 47.011 (LexisNexis2012) because one of the defendant resides in this county and one of the causes of action arose in this County.

1091685.3

## FACTUAL BACKGROUND

### I.     The Accident

25.     On or about July 19, 2010, Plaintiff SUZANNE P. MCCARTHY rented one 2009 Ford Focus vehicle, 1FAHP36N29W218993 (hereinafter "subject vehicle) from Defendant ENTERPRISE located at 4509 Tamiami Trail, Port Charlotte, FL 33980.

26.     On the afternoon of August 16, 2010, Plaintiff SUZANNE P. MCCARTHY placed the subject vehicle into what she reasonably believed was park on her driveway.  Because her driveway is sloped, Ms. MCCARTHY also set the emergency/parking brake.

27.     Reasonably believing the subject vehicle was in "park" and the emergency/parking brake was set, Ms. MCCARTHY exited the subject vehicle fully with the engine running.    The subject vehicle remained motionless, with the engine idling. Ms. MCCARTHY then walked around to the passenger side rear door, opened it, took her grandson, then 16-month-old M.W., from the rear seat.

28.     M.W. was standing next to Ms. MCCARTHY when the subject vehicle suddenly and without warning began moving rearwards.  The subject vehicle struck M.W. and Ms. McCarthy and M.W.'s sustained head and other injuries and Ms. McCarthy sustained severe resulting lower back injuries.  The subject vehicle continued to roll down the driveway, entering the intersection of Long Beach Street, and then came to rest in a neighbor's driveway.

29.     As result of this incident, Ms. MCCARTHY sustained significant injuries to her neck and back and continues to suffer excruciating back pain despite undergoing surgeries.

30.     As a result of this incident, M.W. has suffered seizures and has exhibited problems with speaking and walking.    Furthermore, despite receiving regular physical, occupational, and speech therapy, M.W. has shown only marginal progress toward recovery and

lags significantly behind normal development for children in his age group.  Since the incident, his physicians have observed decreased balance, a regression in basic communication and motor skills, and a diminished ability to focus on tasks and follow directions.

31.  Defendant ENTERPRISE has been instructed in writing to preserve the subject vehicle.  Defendants FORD and ENTERPRISE were both already also given an opportunity to inspect the accident scene.

## ALLEGATIONS REGARDING THE PARK-TO-REVERSE DEFECT AND FORD MOTOR COMPANY'S KNOWLEDGE AND CONDUCT

32.  A "park-to-reverse" defect can exist in a vehicle equipped with an automatic transmission when there is inadequate mechanical force ("detenting force") provided by the automatic transmission system to ensure that a vehicle always defaults into an intended gear position (such as park or reverse) when an operator inadvertently does not fully shift into the very center of the intended gear position.

33.  In a vehicle with a park-to-reverse defect, an operator of the vehicle in normal use can inadvertently and unintentionally place the shift selector between the intended park and reverse gear positions.  Rather than defaulting into the park or reverse gear position inside the transmission (called a "detent") as it would in a properly designed vehicle which meets industry standards (and Ford's own standards), in a vehicle with a park-to-reverse defect, the shift selector can remain for a period of time (several seconds or longer) between the intended park and reverse gear positions and from this "false park" position the vehicle then may (or may not) have a delayed engagement of powered reverse.

34.  Because of the possible delay in the engagement of reverse gear when an operator places the vehicle into what, from the vehicle's "cues," the operator would reasonably believe to be "park," the park-to-reverse defect is unreasonably dangerous because an operator

may have exited the vehicle, or be exiting the vehicle, when the vehicle suddenly and unexpectedly moves backwards in powered reverse.

35.     As a result of injuries and deaths resulting from park-to-reverse accidents in vehicles equipped with an automatic transmission (also referred to as "inadvertent rearward movement") from at least the 1950's and 1960's, the automobile industry, and FORD in particular, has long been aware of the defect, and the need to design vehicles so as to prevent the vehicle's shift selector from being inadvertently placed in a position between the intended park and reverse gear positions from which the vehicle can then have a delayed engagement of reverse.

36.     Defendant FORD, specifically, was well aware of the need to design its automatic transmission system so that an operator could not leave the vehicle between park and reverse from which there could be a delayed engagement of reverse.   Notice to Defendant FORD, well prior to Plaintiffs' injuries, of the need to design vehicles to avoid a park-to-reverse defect included:

37.     Numerous park-to-reverse accidents in various vehicles made by Defendant FORD in the 1970's, 1980's and 1990's about which Ford received notice through customer complaints.   These included hundreds of complaints on a wide range of models equipped with the same or substantially similar transmission as the subject vehicle;

38.     FORD investigated the park-to-reverse safety issue in the early 1970's. It was, at that time, the third highest volume safety complaint being logged in Customer Relations Potential problem reports;

39.     Numerous reports of injuries and deaths and an investigation by the National Highway Traffic Safety Administration ("NHTSA") of Defendant FORD's vehicles

equipped with C-3, C-4, C-6, FMX and JATCO Automatic Transmissions. In 1980, NHTSA received reports of over 23,000 problems of inadvertent vehicle movement on FORD built vehicles, resulting in 5,593 accidents, 1,720 injuries, and 97 deaths.

40.    In February 1980, FORD reported knowledge of 2,252 accidents, 1,818 property damage, 703 injuries and 42 fatalities involving vehicles where inadvertent rearward movement was involved. FORD also reported at least 361 lawsuits involving allegations of inadvertent rearward movement.

41.    In a political agreement signed with the Department of Transportation, over the objections of NHTSA, on December 30, 1980, FORD agreed to send warning labels to approximately 22 million owners rather than, as NHTSA believed necessary, recalling them for mechanical repair.

42.    A 1985 NHTSA study found that FORD park-to-reverse accidents had caused a total of at least 306 deaths.

43.    In October 1991, FORD instituted a recall of Ford Aerostars, Bronco II's, Explorers and Rangers built in 1989-1991 to remedy a park-to-reverse problem in these vehicles.

44.    Well aware of the cause of the defect, and its danger, Ford designed the circuit boards in certain of its vehicles so Ford could easily install an out-of-park alarm to warn drivers when the vehicle was in false park.

45.    Despite numerous accidents, injuries, and deaths in park-to-reverse accidents, Defendant FORD elected not to install out-of-park alarms on all of its vehicles susceptible to park-to-reverse problems (and only recently installed them on a few vehicles such as the Ford Escape) or design its vehicles' transmissions to prevent the problem. Ford instead

adopted a consistent policy of refusing to admit the existence of the defect in the vehicles, and instead blaming any resulting accidents, injuries, or deaths on "operator error."

46.   The standard of care in the automobile industry is to fully investigate complaints or reports received by an automobile manufacturer which appear to pose a potential or actual safety risk.

47.   The investigative process by which complaints or accident reports are investigated is a technique called "root cause analysis" in which the vehicle manufacturer's engineering staff or outside consultants will (a) determine if the issue is safety-related; (b) carefully analyze the complaint to fully understand it; (c) attempt to reproduce the complaint on the subject vehicle or an exemplar; (d) determine if the problem is a manifestation of a unique vehicle feature (e.g., a vehicle manufacturing defect); (e) if the problem is not so identified, identify the engineering feature of the product which allows for the mechanical system to perform in the manner complained of; and (f) determine if there is an engineering solution through redesigning the product which will prevent it as a mechanical system from manifesting the complaint in the system or if an adequate redress is not feasible, then warn adequately to prevent injury.

48.   Despite the engineering standard being to conduct all necessary root cause analysis upon receiving complaints, and the fact that FORD conducted numerous root cause analyses on other potential and actual defects, FORD intentionally and purposefully avoided conducting any adequate root cause analysis on the park-to-reverse defects on any of its vehicles so as to avoid identifying a defect which would require Defendant FORD to undertake expensive measures to fix defective and dangerous vehicles which had been, and were being, sold to its customers and the public .

49.     Defendant FORD's refusal over a period of over 20 years to conduct appropriate and necessary "root cause analysis" was purposeful and intentional and was done with the understanding that its failure to conduct root cause analysis and identify and fix the park-to-reverse defect on its vehicles would result in injuries and deaths, including the resulting injuries to Plaintiffs.

50.     It is appropriate engineering practice in the automobile industry to conduct a Design Failure Mode and Effects Analysis (DFMEA) any time a manufacturer or a supplier of the product creates a new design, makes a design change to an existing design, or has a different application of an existing component or subsystem.

51.     In a DFMEA, engineers engage in a process by which they attempt to identify potential issues that may be presented by the design, redesign, or pairing of components. In a DFMEA, all prior complaints, campaigns, warranty data or other documentation available on a specific component or system company-wide is reviewed and analyzed to identify potential failure modes of a product, develop a test protocol to test for each of the potential failure modes, and through completing such tests to rule out (or identify) the ability of a design, redesign or pairing of components to fail as have earlier designs.

52.     Had an adequate DFMEA been conducted on the transmission systems on Defendant FORD's other vehicles, or the subject vehicle, it would have easily identified the park-to-reverse defect in the subject vehicle.

53.     Yet despite the fact that DFMEA is a standard procedure conducted by Defendant FORD, at no time did FORD conduct any adequate DFMEA on the transmission system of the subject vehicle, or of other of its vehicles as it related to the well-known park-to-reverse problems.

54.     The decision not to conduct an adequate DFMEA on the transmission system of the subject vehicle, or other of Defendant FORD's vehicles, was purposeful and intentional so as not to identify the park-to-reverse defect which would require its being remedied and expose FORD to having to fix at considerable expense prior defective vehicles.

55.     As discussed below Defendant FORD's acts in failing to design so as to prevent the park-to-reverse defect, test the vehicle to determine if the park-to-reverse defect existed, warn of the danger via an out-of-park alarm, or remedy the park-to-reverse defect in the subject vehicle once it was produced was intentional and purposeful and demonstrated a conscious disregard for public safety in that Defendant FORD knew that accidents, serious injuries, and even death, such as that suffered by Plaintiffs would result from Defendant FORD's actions and omissions.

56.     These actions constitute malice, oppression, and/or fraud and were undertaken with the approval of, and were ratified by officers, directors, and managing agents of the company on behalf of Defendant FORD.

## COUNT I
### (STRICT LIABILITY )
### (Plaintiffs against FORD and ENTERPRISE)

57.     Plaintiffs hereby adopt, restate and re-allege each and every paragraph above of this Complaint as if fully and completely set forth herein.

58.     FORD manufactured and designed the subject vehicle.

59.     FORD sold the subject vehicle as a new vehicle to ENTERPRISE.

60.     ENTERPRISE inspected, maintained, serviced, and rented the subject vehicle to Plaintiff SUZANNE P. MCCARTHY.

61.     FORD and ENTERPRISE are strictly liable to Plaintiffs because the subject vehicle was defective and unreasonably dangerous for normal, intended, and reasonably

- 13 -

foreseeable uses due to the park-to-reverse defect that existed in the subject vehicle at the time it left FORD'S control.

62.  This defective transmission design, i.e. where the shift selector can be placed between park and reverse and then experience delayed engagement of reverse, is not mandated by any federal standard or regulation or any industry standard or regulation.

63.  Nevertheless, FORD and ENTERPRISE designed, engineered, tested, assembled, marketed, advertised, inspected, maintained, sold, distributed, and placed on the market and in the stream of commerce a defective product, the subject vehicle with its park-to-reverse defect, unreasonably dangerous to the consumer, knowing that the defective product would reach and did reach the ultimate consumer in the same or without substantial change, in the defective condition that it was in from the date when it left the control of FORD and ENTERPRISE.

64.  FORD and ENTERPRISE knew or should have known that the ultimate users or consumers of this product would not, and could not, inspect the subject vehicle so as to discover the latent defects described above.

65.  FORD and ENTERPRISE knew or should have known of the substantial dangers involved in the reasonably foreseeable use of the subject vehicle, whose defective design and lack of warnings caused it to have an unreasonably dangerous propensity in normal use to have a delayed engagement of a powered reverse from what a reasonable person reasonably believes, and from what the vehicle's "cues" indicate, is "park," and thus has a high propensity to cause injury and/or death to the driver and others.

66.  FORD and ENTERPRISE failed to provide adequate warnings of the substantial dangers known or knowable regarding the park-to-reverse defect at the time of the

- 14 -

subject vehicle's design, engineering, manufacturing, testing, assembly, marketing, advertising, inspection, maintenance, sale, service and/or distribution, up to the time of the subject incident.

67.     Plaintiff SUZANNE MCCARTHY was a foreseeable user of the subject vehicle.

68.     Plaintiff M.W. was a foreseeable passenger of the subject vehicle.

69.     The subject vehicle was, at the time of Plaintiffs' injuries, being used in the manner intended by FORD and ENTERPRISE, and in a manner that was reasonably foreseeable by FORD and ENTERPRISE as involving a substantial danger not readily apparent if adequate warnings of the danger were not given.

70.     The wrongful misconduct, acts, and omissions of FORD and ENTERPRISE in manufacturing, designing and placing into the stream of commerce a defective product, namely the subject vehicle with its park-to-reverse defect, were the direct and proximate cause of the accident in question and the resulting injuries to Plaintiffs.

71.     As a result of FORD's wrongful misconduct, FORD and ENTERPRISE is strictly liable to Plaintiffs for all resulting damages.

72.     FORD is further liable to Plaintiffs damages as a result of its decision to continue to design and manufacture defective vehicles as the subject vehicle, despite the countless injuries and fatalities caused by the park-to-reverse defect in its vehicles, and its failure to adequately warn the unsuspecting consumers was malicious, fraudulent, and grossly negligent and was undertaken with the approval of, and was ratified by officers, directors, and managing agents of the company on behalf of FORD.

J091685.3

## COUNT II
## (NEGLIGENCE)
### (Plaintiffs against Ford)

73.     Plaintiffs hereby adopt, restate and re-allege each and every paragraph above of this Complaint as if fully and completely set forth herein.

74.     Defendant directly, or indirectly, negligently designed, tested, inspected, labeled, packaged, distributed, promoted, marketed, advertised, or sold, into the stream of commerce the subject vehicle, which Defendant knew or should have known, in the exercise of ordinary care, was unreasonably dangerous.

75.     At all times material hereto, Defendant had a duty to consumers and foreseeable users and passengers such as Plaintiffs SUZANNE P. MCCARTHY and M.W. to exercise reasonable care in the design, testing, inspection, labeling, packaging, distribution, promotion, marketing, advertising, sampling or sale of the subject vehicle.

76.     Defendant breached their duty through the following actions and/or omissions which include, but not are not limited to:

a.     Failing to use due care in the design, testing, inspection, marketing, advertising, maintenance, sale and/or distribution of the subject vehicle;

b.     Failing to keep themselves appraised and knowledgeable of any and all potential safety issues associated with the 2009 FORD Focus, the predecessor FORD Focus models, all predecessor vehicles, and all substantially similar vehicles;

c.     Failing to request and/or obtain pertinent information from FORD regarding any safety-related issues associated with the 2009 FORD Focus, the predecessor FORD Focus models, all predecessor Ford vehicles, and all substantially similar vehicles;

d.     Failing to provide adequate and proper warnings to the public and foreseeable users and passengers such as Plaintiff SUZANNE P. MCCARTHY and M.W.

- 16 -

through Plaintiffs ANASTAZIA J. WOOD and JUSTIN WOOD, of the subject vehicle's unreasonably high propensity to be involved in park-to-reverse incidents when used in the manner for which it was intended;

        e.      Failing to notify the public and foreseeable users and passengers such as Plaintiff SUZANNE P. MCCARTHY and M.W. through Plaintiffs ANASTAZIA J. WOOD and JUSTIN WOOD of reported 2009 FORD Focus park-to-reverse incidents and thus materially misrepresenting and/or omitting information regarding the safety of the subject vehicle;

        f.      Otherwise being careless and negligent.

77.    Defendant knew or should have known from the prior NHTSA investigations of predecessor vehicles for the park-to-reverse defect that the subject vehicle contained the unreasonably dangerous park-to-reverse defect and therefore had an unreasonably high propensity to self-shift from park to reverse.

78.    Defendant knew or should have known there were safer alternatives and adequate corrections available, which would have avoided the damage to Plaintiffs had they been utilized.

79.    Defendant designed, tested, investigated, marketed, advertised, inspected, sold, distributed, and placed on the market and in the stream of commerce a defective product, the subject vehicle, in a condition unreasonably dangerous to the consumer, knowing that the product would and did reach the ultimate consumers without substantial change in the defective condition it was in when it left Defendant's control.

80.    Plaintiff SUZANNE MCCARTHY was a foreseeable user of the subject vehicle.

1091685.3

81.     Plaintiff M.W. was a foreseeable passenger of the subject vehicle.

82.     Defendant's negligence and wrongful misconduct was the direct and proximate cause of the damages suffered by Plaintiffs.

83.     FORD is further liable to Plaintiffs for damages as a result of its decision to continue to design and manufacture defective vehicles as the subject vehicle, despite the countless injuries and fatalities caused by the park-to-reverse defect in its vehicles, and its failure to adequately warn the unsuspecting consumers was malicious, fraudulent, and grossly negligent and was undertaken with the approval of, and was ratified by officers, directors, and managing agents of the company on behalf of FORD.

## COUNT III
### (NEGLIGENCE)
### (Plaintiffs against Enterprise)

84.     Plaintiffs hereby adopt, restate and re-allege each and every paragraph above of this Complaint as if fully and completely set forth herein.

85.     This Defendant directly, or indirectly, negligently inspected, serviced, marketed, advertised, maintained, and rented the subject vehicle, which Defendant knew or should have known, in the exercise of ordinary care, was unreasonably dangerous.

86.     At all times material hereto, Defendant had a duty to consumers and foreseeable users and passengers such as Plaintiff SUZANNE P. MCCARTHY and M.W. to exercise reasonable care in the inspection, marketing, advertising, maintenance, and rental of the subject vehicle.

87.     Defendant breached their duty through the following actions and/or omissions which include, but not are not limited to:

1091685.3

a.      Failing to use due care in the inspection, marketing, servicing, advertising, maintenance, and/or rental of the subject vehicle including, but not limited to, failure to properly inspect and maintain the emergency brake on the subject vehicle;

b.      Failing to keep themselves appraised and knowledgeable of any and all potential safety issues associated with the 2009 FORD Focus, the predecessor FORD Focus models, all predecessor vehicles, and all substantially similar vehicles;

c.      Failing to request and/or obtain pertinent information from FORD regarding any safety-related issues associated with the 2009 FORD Focus, the predecessor FORD Focus models, all predecessor Ford vehicles, and all substantially similar vehicles;

d.      Failing to provide adequate and proper warnings to the public and foreseeable users and passengers such as Plaintiff SUZANNE P. MCCARTHY and M.W. through Plaintiffs ANASTAZIA J. WOOD and JUSTIN WOOD, of the subject vehicle's unreasonably high propensity to be involved in park-to-reverse incidents when used in the manner for which it was intended;

e.      Failing to notify the public and foreseeable users and passengers such as Plaintiff SUZANNE P. MCCARTHY and M.W. through Plaintiffs ANASTAZIA J. WOOD and JUSTIN WOOD, of reported 2009 FORD Focus park-to-reverse incidents and thus materially misrepresenting and/or omitting information regarding the safety of the subject vehicle;

f.      Otherwise being careless and negligent.

88.     Defendant knew or should have known from the prior NHTSA investigations of predecessor vehicles for the park-to-reverse defect that the subject vehicle

- 19 -

contained the unreasonably dangerous park-to-reverse defect and therefore had an unreasonably high propensity to self-shift from park to reverse.

89.   Plaintiff SUZANNE MCCARTHY was a foreseeable user of the subject vehicle.

90.   Plaintiff M.W. was a foreseeable passenger of the subject vehicle.

91.   Defendant's negligence and wrongful misconduct was the direct and proximate cause of the damages suffered by Plaintiffs.

**COUNT IV**
**CLAIMS OF SUZANNE P. MCCARTHY AGAINST CRAIG R. WOLFF,**
**M.D. AND THE LASER SPINE INSTITUTE, LLC, AND LASER SPINE**
**SURGICAL CENTER, LLC**

1.   At all times material hereto, the Defendant, CRAIG R. WOLFF, M.D., was a physician duly licensed to practice medicine in the State of Florida specializing in orthopedic spine surgery.

2.   At all times material hereto, the aforesaid CRAIG R. WOLFF, M.D., was acting within the course and scope of his employment and/or agency with the Defendants, LASER SPINE INSTITUTE, LLC, and LASER SPINE SURGICAL CENTER, LLC.

3.   At all times material hereto, the Defendant, CRAIG R. WOLFF, M.D., had a duty to provide medical care and treatment to the Plaintiff, SUZANNE P. MCCARTHY, in accordance with prevailing professional standards of care.

4.   On or about January 30, 2012, and April 16, 2012, Dr. Wolff, and other physicians at the aforesaid LASER SPINE INSTITUTE, LLC, and LASER SPINE SURGICAL CENTER, LLC, performed surgical procedures regarding the cervical and lumbar pain that the Plaintiff, SUZANNE P. MCCARTY, was experiencing as a result of the aforesaid August 16, 2012, automobile accident.

- 20 -

5.      On January 30, 2012, Dr. Wolff performed a laminotomy/foraminotomy decompression with thermal ablasion at L4-L5 and L5-S1.

6.      The aforesaid surgery performed by Dr. Wolff did not meet acceptable medical standards of care in that:

(a)      Dr. Wolff did not perform the appropriate surgical treatment which would have entailed an anterior decompression procedure such as an anterior cervical decompression and fusion.

(b)      The unilateral posterior decompression procedure performed by Dr. Wolff did not adequately address the pathology of Ms. McCarthy's symptoms which included spinal cord compression and symptoms involving both arms and hands.

(c)      The surgery performed at the LASER SPINE INSTITUTE, LLC, and LASER SPINE SURGICAL CENTER, LLC, BY Dr. Wolff, was a limited posterior decompressive procedure so the presenting pathology, as aforesaid mentioned, was not appropriately addressed.

(d)      As a result, the Plaintiff, SUZANNE P. MCCARTY, was required to undergo a further surgical procedure to address the residual neurologic compression. This procedure, a cervical decompression and fusion, was performed by another physician at a different institution.

(e)      The LASER SPINE INSTITUTE, LLC, and LASER SPINE SURGICAL CENTER, LLC, and Dr. Wolff, deviated from acceptable medical standards of care in the failure to diagnose and treat the cervical disc herniation and resultant neurologic compression.

(f)      Had the appropriate diagnosis been made, and the indicated treatment provided, the Plaintiff, SUZANNE P. MCCARTY, would not have required a second surgical procedure on her cervical spine.

7.      As a result of the aforesaid deviation from acceptable medical standards of care,

1091685.3

the Plaintiff, SUZANNE P. MCCARTY, continued to suffer intractable back pain and she has suffered permanent disability, significant and permanent loss of strength in her back, mental anguish, pain and suffering, emotional distress and the loss of the capacity to enjoy life, in the past and in the future, expenses of hospitalization, medical and nursing care and treatment. These losses are continuing and will continue in the future.

8.      As a further direct and proximate result of the aforesaid deviation from prevailing medical standards of care, the Plaintiff, SUZANNE P. MCCARTY, has lost her ability to work in an efficient manner and therefore, she has suffered past lost earnings and future loss of wager and capacity.

9.      Pursuant to Chapter 766, Florida Statutes, the aforesaid Defendants were placed on notice of the Plaintiff's intent to initiate medical malpractice claim (by certified mail return receipt requested). All other conditions precedent to the bringing of this action have been performed prior to the filing of this action.

10.      In addition, a Petition for Automatic Extension of the Statute of Limitations, was filed herein on or about December 10, 2013, pursuant to Section 766.104, Florida Statutes.

11.      Pursuant to Chapter 766.104(1), Florida Statutes, a Certificate of Reasonable Investigation is attached hereto as Exhibit "A".

Wherefore, Plaintiff, SUZANNE P. MCCARTHY, demands Judgment against the aforesaid Defendants, CRAIG R. WOLFF, M.D., LASER SPINE INSTITUTE, LLC, and LASER SPINE SURGICAL CENTER, LLC, together with costs and a trial by jury of all issues to be tried herein.

- 22 -

1091685.3

**RELIEF REQUESTED**

Wherefore, Plaintiffs M.W., a minor child, through his legal representative and natural guardian, ANASTAZIA J. WOOD, ANASTAZIA J. WOOD, individually, JUSTIN WOOD, individually, and SUZANNE P. MCCARTHY, individually pray that the Court enters Judgment against Defendants FORD and ENTERPRISE in their favor, and award the following relief:

1.      Compensatory damages for M.W., in excess of the sum of Fifteen Thousand Dollars ($15,000.00), exclusive of interest and costs, including but not limited to medical expenses, mental pain and anguish, pain and suffering and permanent disability for the acts complained of herein.

2.      Compensatory damages for Plaintiffs ANASTAZIA J. WOOD, individually and JUSTIN WOOD, individually, in excess of the sum of Fifteen Thousand Dollars ($15,000.00), including, but not limited to, medical expenses, mental pain and anguish for the acts complained of herein.

3.      Compensatory damages for Plaintiff SUZANNE P. MCCARTHY, individually, in excess of the sum of Fifteen Thousand Dollars ($15,000.00), including, but not limited to, pain and suffering, medical expenses, future earnings, permanent injuries and mental pain and anguish for the acts complained of herein.

4.      The costs of this action, to the extent recoverable;

5.      A trial by jury of all issues to triable as a matter of right; and

6.      Such other relief as may be appropriate under the circumstances.

- 23 -

Respectfully submitted,

**ALFORD LAW GROUP, P.A.**

Dated:  November 24, 2014      By: _____

C. Wayne Alford, Esq.
Charles Alford, Esq.
8833 Perimeter Park Boulevard, Suite 104
Jacksonville, FL 32216
Telephone      (904) 642-9899
Facsimile:      (904) 642-9987

Fabrice N. Vincent
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:      (415) 956-1000
Facsimile:      (415) 956-1008

*Attorneys for Plaintiffs*

1091685.3